IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2020

## RONALD L. COSPER v. STATE OF TENNESSEE

Appeal from the Criminal Court for Hamilton County
No. 304925     Barry A. Steelman, Judge

_____

### No. E2020-00024-CCA-R3-PC

_____

The petitioner, Ronald L. Cosper, appeals the denial of his petition for post-conviction relief, which petition challenged his convictions of first degree felony murder and attempted especially aggravated robbery, alleging that he was deprived of the effective assistance of counsel.  Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Brandy Spurgin-Floyd (at hearing and on appeal) and Melody Shekari (at hearing), Chattanooga, Tennessee, for the appellant, Ronald L. Cosper.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Neal Pinkston, District Attorney General; and Andrew Coyle, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Hamilton County jury convicted the petitioner of first degree felony murder and attempted especially aggravated robbery for the July 2012 events culminating in the fatal shooting of the victim.  *State v. Ronald Levon Cosper*, No. E2016-00212-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Knoxville, May 12, 2017).  In affirming the petitioner's convictions, this court summarized the evidence on direct appeal:

> [T]he evidence shows that the day before the crimes occurred, [Dustin] Hayes, [Blake] Lee, and the [petitioner] were driving in the vicinity of the victim's house when the [petitioner] made statements that he knew of a house where a robbery could be

committed. On July 2, 2012, the [petitioner] began asking for a ride, and Mr. Hayes knew the [petitioner] wanted to commit a robbery. As Mr. Hayes drove the [petitioner] to a location the [petitioner] requested, the [petitioner] stated he wanted to "pick up some heat," and the [petitioner] later made a statement to [Devante] Stoudemire about "a lick that we were going to go hit." The [petitioner] also made a statement that his intended target was a "weed man." When they reached the area of the victim's house, Mr. Stoudemire gave the [petitioner] a gun, and the [petitioner] left the car and disappeared into a "cut." The victim was shot, and his house showed signs that a struggle occurred. . . .

The evidence shows, as well, that . . . the victim resisted and that the [petitioner] shot the victim to get the victim off him. . . .

*Id.*, slip op. at 21-22. The petitioner received an effective life sentence. *Id.*, slip op. at 1.

The petitioner filed a pro se petition for post-conviction relief followed by two amended petitions after the appointment of counsel, alleging the ineffective assistance of his trial counsel.

At the bifurcated evidentiary hearing, trial counsel testified that he was the third attorney appointed to the petitioner's case beginning in November 2014, only five months before the April 2015 trial. He stated that the court asked if he could be prepared for trial in such a short timeframe, and he assured the court that he could, prioritizing the petitioner's case and beginning work immediately. He met with the petitioner's prior counsel to learn the status and details of the case up to that point, and he continued to work with the same investigator that prior counsel had used. Counsel stated that his trial preparations included a "thorough review" of all discovery materials, meeting with the petitioner at least 15 times at the jail, interviewing all three of the State's expert witnesses and reviewing their reports, interviewing the State witnesses who were willing to talk with him, and attempting to locate potential alibi witnesses. Trial counsel acknowledged that this was his first jury trial but stated that he consulted with an associate attorney who had "quite a bit of experience."

Trial counsel said that the State never made a plea offer to the petitioner. The prosecutor had told counsel that the State had no intention of offering a plea agreement but would consider a "reasonable offer" from the petitioner. He stated that approximately one month prior to trial, the petitioner asked if the State would be willing to let him plead guilty

to reckless homicide to which counsel explained that the State would not "be in a position to do a reckless homicide" in a first degree murder case. He advised the petitioner to consider offering the State a plea agreement of second degree murder. One day before trial, the petitioner "signed off on" a plea offer to second degree murder with a 20-year sentence. Trial counsel stated that he "immediately" took the offer to the prosecutor, but that night the prosecutor rejected the offer, stating that he would "take this case to trial." Counsel said that he believed that the petitioner understood that no deal had been struck at the time he authorized the plea offer.

Trial counsel stated that Cheryl Billups, a key State witness, was unwilling to talk with him or his investigator when they had attempted to interview her, but the State arranged for him to interview Ms. Billups shortly before trial to avoid a voir dire of her testimony. Counsel said that, up until that point, he believed Ms. Billups' testimony would be key to establishing the petitioner's identity as one of the perpetrators but did not know the basis for her knowledge or what evidence her testimony would reveal. He knew from discovery materials that Ms. Billups had not identified the petitioner to law enforcement and had not been asked to identify a perpetrator from a photographic array, but counsel expected the State to ask Ms. Billups to identify the petitioner in court because she had previously identified him by name to prosecutors. Counsel also suspected that Ms. Billups had identified the petitioner as a perpetrator only because he was identified as the defendant in the case and not because she knew him from the events she witnessed. He stated that at trial, the State did not elicit an in-court identification from Ms. Billups, which put him "in a very precarious position" of wanting to emphasize the fact that Ms. Billups could not identify the petitioner without "eliciting the identification that the State had failed to make." He acknowledged that he did not move to suppress Ms. Billups' identification of the defendant but said that, at trial, Ms. Billups described the man she saw as being much shorter than the defendant, and she said that she only knew of the defendant's identity because she had seen his name on a subpoena.

Trial counsel stated that a couple of weeks before the trial, he learned that co-defendant Hayes was to testify as a State's witness against the petitioner. The only other evidence linking the petitioner to the crime scene were the petitioner's fingerprints that were found on the glass door of the victim's home and potential gunshot residue found on his shorts. Counsel stated that Mr. Hayes had provided three statements to the police during the course of the investigation. Counsel acknowledged that he did not play the recordings of Mr. Hayes's statements during the trial but explained that the third of the statements was largely consistent with his trial testimony, and counsel feared that suggesting that the first two statements were untruthful would reinforce the truthfulness of the third statement and his trial testimony. Counsel said that he decided to impeach Mr. Hayes by emphasizing to the jury that Mr. Hayes received a "really great deal" from the State in exchange for his testimony.

Trial counsel stated that he reviewed the standard jury instructions before trial but acknowledged that he did not discuss the instructions with the petitioner. He also acknowledged that the trial court's jury instructions did not include, and he did not request, a charge for facilitation or solicitation.

Trial counsel said that he interviewed potential alibi witnesses, including Blake Lee, Marcus Lee, and Heaven Wilson. He discussed the alibi with the petitioner and filed a notice of an alibi defense. Counsel explained, however, that after several interviews with the potential witnesses, he was unsuccessful in "piec[ing] together an alibi" because "there were holes in the time frame around when [the offenses] occurred." He said that he explained the matter to the petitioner and that he would have raised an alibi defense if he thought that the evidence supported one.

Counsel recalled that on the day of trial, the State informed him that it would not pursue a conspiracy charge that comprised count three of the indictment; however, before the State dismissed the charge, the jury had already received preliminary instructions, including reference to the conspiracy charge. Counsel acknowledged that he did not object to the inclusion of the conspiracy charge in the preliminary instructions, nor did he request a curative instruction.

Trial counsel acknowledged that he did not move to exclude reference to Mr. Stoudemire's nickname, "White Chalk," which name was used throughout the trial. He stated that he considered such a motion but ultimately decided against it because he thought it could be helpful to have someone with an incriminating-sounding name that "we could potentially point to as the person who did it." Counsel said that he was familiar with Mr. Stoudemire and understood his nickname to be "based off of his reputation" and a reference to the white lines drawn by investigators at the scene of a homicide to indicate the victim's location.

Trial counsel acknowledged that he did not object to the prosecutor's statement in closing argument that "'our job is to prosecute the most dangerous offenders . . . and sometimes, in order to prosecute those individuals, murderers like the defendant, rapists, kidnappers, armed robbers like the defendant, agreements have to be made. . . . because it's important that murderers and robbers like the defendant are taken off the street[.]'" Counsel stated that, "upon reflection, I believe it [wa]s objectionable" because it was "overtly prejudicial," noting that, at that time, the petitioner had not yet been convicted of murder or robbery and was not charged with rape or kidnapping. Counsel also stated that he believed it was possible for a prosecutor to "over-sell[] a case" by using that sort of "over the top" language and that "to some extent . . . you have to trust your jurors to . . . not be swayed by mere rhetoric." He said that in his closing argument, he

-4-

asked the jury to consider the evidence fairly and to "not be swayed by the emotions of it." Trial counsel admitted that he did not raise the matter on direct appeal "[b]ecause I didn't think of it." He continued: "[M]y view is that a defense attorney should not object to everything that is objectionable, and . . . . I did not see that as an issue."

During cross-examination, trial counsel explained that discrediting Mr. Hayes's testimony was important to the petitioner's defense, and in his closing argument counsel argued that Mr. Hayes's testimony lacked credibility because he received a favorable plea agreement of pretrial diversion in exchange for his testimony against the petitioner. Counsel reiterated that the State never offered the petitioner a plea agreement and stated that he advised the petitioner to make a reasonable offer to the State in advance of trial, but the petitioner waited until the evening before trial to make such an offer. Trial counsel said that prior counsel had interviewed potential alibi witnesses and had told trial counsel that he did not "'see how we can piece together an alibi," and trial counsel "attempted to verify that" by interviewing the potential witnesses himself. After his independent investigation, he determined that there was not an alibi defense, and he did not want to put forward alibi witnesses who would be subject to cross-examination by two experienced prosecutors.

Trial counsel stated that Ms. Billups was the only eyewitness who could have potentially identified the petitioner as a perpetrator other than Mr. Hayes and Mr. Stoudemire. Counsel said that the prosecutors seemed surprised by some of Ms. Billups' statements when counsel interviewed her at the meeting arranged by the State, and he "saw some advantage to that." He said that he was surprised that the State did not have Ms. Billups identify the petitioner in court and that on cross-examination, he questioned Ms. Billups in a way that "tried to elicit the things that helped the defense without prompting an identification."

Trial counsel stated that he strategically cross-examined Mr. Hayes about the prior inconsistent statements he made to police while carefully avoiding "eliciting anything that would help the State by unintentionally asking the wrong question." Counsel stated that he did not believe that there was a basis for requesting a jury instruction on facilitation or solicitation. He explained that his defense strategy was to argue to the jury that the State had not presented sufficient evidence to prove the petitioner's identity as the one of the perpetrators. He stated that he drew his own inference as to Mr. Stoudemire's nickname "White Chalk" referring to homicide scenes and that he did not draw the jury's attention to the inferred meaning, explaining, "I don't have a problem with there being some other bad actor in the picture."

On redirect examination, trial counsel stated that his interviewing Ms. Billups "gave me some things that I could bring out in cross-examination, and I thought

that I did that." Counsel acknowledged that he did not file a bond motion and that, if he had done so, he could have had the opportunity to question Ms. Billups in the motion hearing. He explained, however, that he believed courts "look pretty unfavorably" on a party using a bond motion solely to have a hearing in which they can learn the testimony of a potential witness. Counsel recalled that the prosecutor may have indicated that the State would consider a plea agreement with a 30-year sentence but again said that the State never made an offer.

Heaven Wilson, the sister of Blake Lee, testified that she knew the petitioner as her brother's best friend. She stated that, at the time of the underlying offenses, she was 15 years old and living with her mother and two brothers on East 18th Street in Highland Park. She said that the petitioner had spent the night at her house on July 1, 2012, and the next day they "[w]atched movies, probably walked to the store a couple times, . . . just what we did every day." She said that she woke up that day between 9:00 a.m. and 10:00 a.m., and the petitioner was at the house when she woke up. Her brother Blake Lee was also present, but he did not remain at the house the entire day. She said that Mr. Hayes "[p]robably came by" her house that day. She stated that, anytime she went to the store that day, the petitioner walked with her because she "was young." She estimated that she left the house no more than three times that day and that the petitioner was with her each time. Ms. Wilson said that the petitioner was with her throughout the day until "[a]round nightfall" when "[h]e left to go to my cousin's house" in Hixson. She recalled that the petitioner left her house on July 2 with her sister, Brittany Moody. She denied that the petitioner left with Mr. Hayes.

Ms. Wilson stated that she told this information to the petitioner's attorney, an "older," "Caucasian male," before the trial. She acknowledged that she never spoke to the police about this information, explaining, "I was 15 years old. I didn't think to call the police in. Why call them if they, . . . already think he did it?" Ms. Wilson stated that she was not subpoenaed to be a witness for the petitioner's trial but that her brothers told her that she had been listed as an alibi witness on the petitioner's alibi notice. She said that she was not present at the trial because she was in school.

The petitioner testified that the State did not extend a plea offer before trial counsel was appointed to his case. He said that counsel did not raise the possibility of a plea agreement until the Friday before trial. The petitioner asked counsel about offering to plead guilty to a reckless homicide charge, but counsel told him "'that'll never happen.'" He was asked to consider an agreement to a 30-year sentence, but the petitioner declined to discuss such an offer, stating that "[i]t was out of the question." He told counsel that he would accept a plea agreement for a 15-year sentence, but counsel told him that the State would not accept such an offer. After much "back-and-forth," the petitioner signed a paper, agreeing to a 20-year sentence, explaining that he wanted to put his family's "mind at ease

-6-

about me ever coming home" and "establish an out date" for his release. The petitioner said that counsel told him that the only reason he would return to visit the petitioner was if the State insisted on a longer sentence. He said that he understood that the State was extending the plea offer, explaining that he "wouldn't have been willing to" make an offer to the State. The petitioner said that counsel told him that he needed to take the paper that the petitioner had signed to the prosecutor "'and get everything officialized' or whatever." The petitioner stated that counsel returned three to four hours later and told him that the State was unwilling to let him "take the offer" but that "with your alibi and Ms. [Billups'] description, . . . it'll be hard for them to convict you." The petitioner said that he asked counsel for a copy of the paper that he signed, but counsel told him that it was lost or misplaced and that "'[i]t won't matter. It wasn't officialized in front of a judge, so it's like it never happened.'"

The petitioner stated that trial counsel had three potential witnesses for an alibi defense but that counsel told him, "'You might not want to use them'" because two of them were not with the petitioner throughout the day. The petitioner said that Ms. Wilson was with him the entire day, noting that, because she was only 15 years old, he would always walk with her to the store to purchase cigarettes for her. The petitioner asserted that counsel never told him that his "alibi was shaky" or that he was not going to call Ms. Wilson as a witness. The petitioner acknowledged that Mr. Hayes testified at trial that he drove the petitioner, Mr. Lee, and Mr. Hayes to the area of the victim's house, but the petitioner insisted that he did not go with Mr. Hayes. Upon further questioning, the petitioner acknowledged that he left Ms. Wilson's house "late in the day" with Mr. Hayes, Ms. Moody, and Ms. Moody's brother to go downtown.

The petitioner stated that some of the State's witnesses had made inconsistent statements and that he raised the matter with trial counsel but that counsel made no motions or objections to any inconsistent statement. According to the petitioner, throughout trial, counsel would tell him "'[t]here is no reason to object or enter [Mr. Hayes's prior inconsistent] statement, because he's supposed to be testifying truthfully to what he know[s] today.'" As to Ms. Billups' statements, counsel told the petitioner that he didn't want to challenge her prior statements because her description of the perpetrator did not match the petitioner. When Ms. Billups referred to the petitioner by name, counsel told the petitioner that there was nothing he could do about it.

The petitioner said that he learned that the State was going to dismiss the conspiracy charge immediately before jury selection began. He said that he repeatedly asked counsel for a copy of the jury instructions but that counsel did not provide them. He stated that counsel told him that the jury instructions were not "really for you" and that he could review them while sitting at the table in the courtroom. The petitioner also stated that he told trial counsel that he did not want Mr. Stoudemire referred to as "White Chalk"

at trial because it could cause the jury to find him guilty by association but that counsel did not object to the use of the nickname.

During cross-examination, the petitioner acknowledged that the State had indicated that it was willing to offer a plea agreement for a 30-year sentence but that he was unwilling to accept such an offer. The petitioner said that, on the night of July 2, he was in a vehicle with Ms. Moody, Mr. Moody, Blake Lee, Mr. Hayes, and three other people. He said that Mr. Hayes was in the vehicle with them because he had locked his keys in his own car. The group picked up the petitioner at Ms. Wilson's house sometime after 5:00 p.m., and they "went downtown and to Hixson." The petitioner said that he told counsel that Blake Lee, Marcus Lee, and Heaven Wilson could serve as alibi witnesses but that he did not give counsel the names of the other people in the group that went downtown because "they live in Humboldt" and because he was only with them after the time the homicide took place and "it wouldn't help the alibi." The petitioner acknowledged making false statements to the police.

The petitioner stated that, when trial counsel met with him to discuss a potential plea agreement, counsel was on his laptop, and the petitioner believed that he was emailing back and forth with the prosecutor about the plea negotiations. He explained that when he would suggest a sentence that he was willing to accept, counsel would type "and then something come through and he'll say, 'Well, what do you think about this?'" The petitioner would ask counsel to tell the prosecutor certain things, and counsel "would type it in." The petitioner said that counsel never discussed a trial strategy with him, stating, "His whole thing was Ms. Billups's description is what should free me. That was his whole -- that's the only thing he cared about was her description."

On redirect examination, the petitioner stated that the homicide was alleged to have occurred between 2:00 p.m. and 2:30 p.m. on July 2, and his friends did not pick him up to go downtown until sometime after 5:00 p.m.

At the close of the evidence, the post-conviction court took the matter under advisement. In its written order denying post-conviction relief, the court accredited trial counsel's testimony that the State did not make a plea offer and that counsel advised the petitioner "not to leave a reasonable plea offer until the eve of trial." The court found that the State did not elicit an identification of the perpetrators from Ms. Billups at trial and that the petitioner identified "no ground for counsel to move to suppress Ms. Billups's eyewitness testimony." The court also found that the petitioner failed to establish that he was prejudiced by counsel's failure to play recordings of Mr. Hayes's prior inconsistent statements at trial. Additionally, the court found no prejudice by counsel's failure to request jury instructions on facilitation and solicitation because the jury, although

-8-

instructed on several lesser included offenses, convicted the petitioner of the charged offenses.

The post-conviction court accredited trial counsel's testimony that he interviewed potential alibi witnesses but was "unable to piece together an alibi from their accounts." Furthermore, the court found that counsel's decision to not draw the jury's attention to an erroneous reference to a third charge was reasonable and that the trial court's final jury instructions cured any error. The court also found that any prejudicial effect from the use of a co-defendant's nickname "White Chalk," even if suggesting a "homicidal reputation," was negligible in light of the other evidence. Finally, the court found that the prosecutor's referring to the petitioner as a murderer and armed robber in closing argument was "merely" a reference to "the theory of the prosecution that the petitioner had the leading role in the offenses, *i.e.*, the prosecution's interpretation of the evidence."

In this timely appeal, the petitioner alleges eight instances of deficient performance by trial counsel: 1) trial counsel failed to challenge the admissibility of Ms. Billups' identification of the petitioner; 2) trial counsel failed to impeach the State's witnesses with prior inconsistent statements; 3) trial counsel failed to request jury instructions on the lesser included offenses of facilitation and solicitation; 4) trial counsel failed to call alibi witnesses; 5) trial counsel failed to move for a mistrial or ask for a curative instruction for the erroneous inclusion of the conspiracy charge in the jury's preliminary instructions; 6) trial counsel failed to object to the use of Mr. Stoudemire's nickname; 7) trial counsel failed to object to the prosecutor's improper statement in closing argument; and 8) trial counsel failed to challenge the State's reneging on the plea agreement. The State contends that the post-conviction court properly denied relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the

services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner has failed to establish that he is entitled to post-conviction relief. First, several of counsel's alleged failures fall squarely in the realm of strategic decisions. Trial counsel testified that he considered a motion to exclude any reference to Mr. Stoudemire as "White Chalk" but that he found it beneficial to the defense to have a person with an incriminating name to "potentially point to as the person who did it." Similarly, although trial counsel acknowledged that the prosecutor's calling the petitioner a murderer and robber in closing argument was objectionable, he testified that he did not object for strategic reasons. Believing that a prosecutor's "over the top" language can be counterproductive to the State, trial counsel chose to forgo an objection and, instead, argued for the jury to set aside their emotions. Additionally, relative to the petitioner's assertion that trial counsel failed to impeach Mr. Hayes with prior inconsistent statements, the record reveals that counsel thoroughly impeached Mr. Hayes with his prior statements to police, and counsel explained that he strategically opted to not offer the recordings of those statements because he feared they could bolster the truthfulness of Mr. Hayes's trial testimony. These are precisely the type of reasonable, strategic decisions that we will not second-guess. *See Adkins*, 911 S.W.2d at 347.

-10-

As to the petitioner's assertion that trial counsel failed to impeach Ms. Billups with prior inconsistent statements, it is unclear to what the petitioner refers. The petitioner states that counsel failed to impeach Ms. Billups with "her own prior testimony that indicated a shorter individual than" the petitioner; however, Ms. Billups did not testify at a pre-trial hearing. Furthermore, on cross-examination, Ms. Billups' description of the perpetrator's height was consistent with the statement she had previously given to police. Because Ms. Billups' testimony was consistent with her prior statement, and because her description of the perpetrator's height benefited the defense, the petitioner has failed to show any deficient performance by counsel on this matter.

Next, as to counsel's failure to present an alibi defense, the post-conviction court specifically accredited trial counsel's testimony over that of Ms. Wilson and the petitioner, finding that counsel interviewed potential alibi witnesses but could not "piece together an alibi from their accounts." Trial counsel's accredited testimony established that the accounting of events from the alibi witnesses left gaps in the timeline of the defendant's alibi, including the time of the offenses. Consequently, counsel did not perform deficiently by deciding to forgo an alibi defense.

The post-conviction court also accredited trial counsel's testimony that the State did not make a plea offer. Counsel testified that the State indicated it would entertain a "reasonable offer" from the petitioner and that he advised the petitioner to consider offering to plead guilty to second degree murder in exchange for a 20-year sentence. Counsel also testified that as soon as the petitioner agreed to the suggested offer, counsel "immediately" communicated the offer to the State. Because the State made no plea offer to the petitioner, this issue lacks merit.

Finally, the petitioner has failed to establish prejudice as to his remaining claims. The petitioner contends that trial counsel should have objected to Ms. Billups' identification of the petitioner at trial. Although Ms. Billups used the petitioner's name several times during her direct testimony, during cross-examination, she admitted that she did not know the petitioner at the time of the offenses and that she identified him as one of the perpetrators only because the State had charged him in this case. In his closing argument, counsel highlighted Ms. Billups' inability to identify the petitioner as one of the perpetrators. Furthermore, other evidence corroborated Mr. Hayes's testimony that the petitioner participated in the offenses, including the petitioner's fingerprints on the victim's door and blood and gunshot residue on the petitioner's shorts.

Similarly, the petitioner has failed to establish that he was prejudiced by counsel's failure to request a jury instruction on the lesser offenses of facilitation and solicitation. The trial court instructed the jury on numerous lesser included offenses of each charge and instructed the jury, "If you find the defendant guilty beyond a reasonable

doubt of a listed offense, then you must return a verdict and must not consider or attempt to reach a verdict on any other offense below it on the list." Even if the facts supported an instruction on facilitation or solicitation, we must presume that the jury "follow[ed] the instructions of the trial court," *see State v. Inlow*, 52 S.W.3d 101, 106 (Tenn. Crim. App. 2000) (quoting *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998)), and consequently, would not have considered a verdict for facilitation or solicitation because it found the petitioner guilty of the charged offenses.

Likewise, the petitioner cannot show that he was prejudiced by trial counsel's failure to object to or request a curative instruction for the inclusion of the dismissed conspiracy charge in the preliminary instructions. The trial court twice instructed the jury that the indictment was not evidence, and, as stated above, the jury is presumed to have followed that instruction. *See Inlow*, 52 S.W.3d at 106 (quoting *Williams*, 977 S.W.2d at 106).

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE